690 So.2d 965 (1997)
STATE of Louisiana In the Interest of KLB and FB, Jr., First-Appellant/ Appellee,
v.
Kathy Lynn BIGGS and Fred Biggs, Sr., Appellees/Second Appellants.
No. 29512-JAC.
Court of Appeal of Louisiana, Second Circuit.
February 28, 1997.
Susan Skidmore, Department of Social Services, Office of Community Services, for First Appellant/Appellee.
Elizabeth Brown, West Monroe, for Appellee/Second Appellants.
Before NORRIS, STEWART and CARAWAY, JJ.
CARAWAY, Judge.
In this action to terminate parental rights, the State of Louisiana, through the Department of Social Services, appeals the trial court's refusal to terminate the parental rights of Kathy Biggs. Also included in this record is an appeal by Fred Biggs Sr., Mrs. Biggs' former husband, who sought review of a subsequent ruling that reduced his visitation with the children. Because Mr. Biggs is *966 now deceased, his appeal is moot and is hereby dismissed. Although we cannot find the trial court abused its discretion in refusing to terminate parental rights, we do find that the order for placement of the children in long-term foster care was premature and remand this case for further proceedings in light of the changed circumstances which have occurred as a result of Mr. Biggs' death and the strong policy of permanent placement as set forth by statute and discussed below.

Factual and Procedural History
Pursuant to a report of child abuse, the Monroe Office of Community Services ("OCS") opened an investigation of Kathy Lynn Biggs and Fred Biggs, Sr. in June, 1989. Left unattended, the Biggs' daughter ("KLB") received second degree burns from an accident involving a cup of coffee. The investigation also revealed a lack of parenting skills on the part of Mr. and Mrs. Biggs as well as unclean living conditions. Floors were not swept, car parts that leaked oil were left on the porch and ash tray spills were observed in the living room. The personal hygiene of the family also varied from satisfactory to poor during the course of the investigation.
On March 4, 1991, the OCS received a report of inadequate shelter regarding the Biggs children (KLB, then age 2 and FB, age 5 months). The investigator found dirty floors, dirty clothes piled in the kitchen, and roaches and clutter throughout the home. When the investigator returned on March 14, 1991, the home was in better condition. However, during the investigator's visit, Mrs. Biggs allowed KLB to go to the restroom unsupervised and the child smeared feces over the bathroom walls. The investigator returned again on April 5, 1991, and found the home in worse condition than when it was first inspected.
Between April and October the OCS worked with the Biggs to improve their housekeeping, personal hygiene, and parenting skills. Mrs. Biggs would clean the home at the urging of the case worker but established no consistency. During this time the children were dirty and two-year-old KLB was found unsupervised in the neighborhood on two occasions. Although parenting skills improved moderately with counseling, the family's hygiene failed to improve. One report of physical abuse turned out to be encrusted dirt on KLB's face.
Between October 28, 1991, and December 30, 1991, a social service specialist spent 95 hours with the Biggs. The specialist taught Mrs. Biggs how to clean the home and care for the children by modeling appropriate behavior. The social worker found Mrs. Biggs helpful and eager to please. A written cleaning schedule and calendar were placed in the kitchen to help Mrs. Biggs remember to clean the home. When the social worker returned to the home three months later she found it to be in a satisfactory condition.
In June, 1992 Janice Madison and Deborah Sherrill, social workers with the OCS, investigated a report of inadequate food and shelter at the Biggs' residence and found rotten food on the porch and the yard swarming with flies. A foul odor emanated from the home and the kitchen sink and bathtub contained standing blackish water. The floor of the home was covered with feces and urine and dirty clothes were piled all around. Empty beer and cola cans were laying on the floor. FB was very dirty and had been playing in feces. KLB had severe body odor. A medical examination revealed both children had Hepatitis B. At this time the children were removed from the home and Mrs. Biggs underwent prosecution for cruelty to a juvenile. She apparently tied KLB to the bedpost to keep her from running away. Mrs. Biggs pled guilty to second degree battery and was sentenced to two years at hard labor. The trial court suspended the sentence and placed her on probation. The children were adjudicated children in need of care pursuant to La.Ch.C. arts. 601 and 666, in September, 1992.
After the children were removed from the home, Allyson Lensing, an OCS case manager continued working with the Biggs on hygiene, parenting, and housekeeping between June, 1992 and November, 1993. She testified that keeping the home clean and free from pests was a continuing problem for the Biggs during this time. Kay Frost, the case *967 manager since November 1, 1993, testified that the Biggs had not completed counseling and their hygiene remained poor.
At the December 15, 1992, dispositional hearing the Biggs consented to the children remaining in the custody of the state. Allyson Lensing, the case manager, testified that the children were being treated for hepatitis and were doing well in foster care. Mrs. Lensing testified that Mrs. Biggs had attended parenting classes and was pursuing her GED and Nursing Assistant Certificate. According to Mrs. Lensing, the Biggs' housekeeping had improved some but the OCS recommended the children remain in foster care.
Another dispositional hearing was scheduled for September 28, 1993; however, several lawyers failed to appear and the hearing was postponed. The next minute entry is dated July 25, 1994, and reflects the filing of the petition to terminate parental rights. The first hearing regarding termination of parental rights was held in December, 1994 at which time Judge Jefferson held his ruling in abeyance for six months to allow the Biggs to improve their parenting, hygiene, and housekeeping. After further hearings in 1995, a judgment refusing to terminate parental rights was filed November 17, 1995. The judgment further stated "that long term foster care be the permanent plan for these minor children" despite the fact that the OCS did not seek such relief nor present evidence as to a "specific foster family" as required by LSA Ch.C. art. 702 B.
Dr. David Dallas Thomason, a clinical psychologist, evaluated the Biggs regarding their parenting ability. Dr. Thomason conducted personal interviews, intelligence testing, and personality test. The testing revealed Mrs. Biggs has an I.Q. of 78 which places her in the slow learner classification. She reads at the ninth grade level and spells on the eighth grade level. Dr. Thomason determined that Mrs. Biggs had the cognitive ability to understand and make changes in her life but her dependence on Mr. Biggs was a negative factor. Mrs. Biggs, however, took responsibility and acknowledged neglect of the children. While Dr. Thomason recognized this as a positive sign, he would not recommend return of children. At trial Dr. Thomason stated:
I think she [Mrs. Biggs] is certainly motivated, clearly motivated to make continuing improvements in her life. And I think that this is a very sad case, and it is very difficult to sit in front of them and to say you can never be trusted to take care of your children. The facts are she has some significant limitations all by herself that could probably be overcome if she was not married to a man that she is caretaker for who appears to be in the process of deteriorating.
Dr. Bobby Stephenson, a psychologist, also examined Mrs. Biggs. Dr. Stephenson found Mrs. Biggs suffered from poor common sense judgment and often did not understand what to do in everyday problem situations. Mrs. Biggs demonstrated significant immaturity and considerable difficulty in being able to take charge of the situation and protect herself and children. Dr. Stephenson opined that Mrs. Biggs would continue a pattern of improvement followed by decline. Based on the exceptional needs of the children and the dynamics of the Biggs home, Dr. Stephenson recommended termination. However, on cross examination Dr. Stephenson admitted that it was possible for people with limitations similar to Mrs. Biggs to successfully raise children.
On appeal the State asserts the trial court erred by placing the children in long-term foster care instead of terminating the Biggs' parental rights and thereby facilitating the adoption of the children.

Law
When children have been removed from the parents' custody following an adjudication as children in need of care, our courts are guided by Title VI Chapter 16 of the Louisiana Children's Code. The pertinent articles provide:
LSA Ch.C. art. 701.
If at any point in child in need of care proceedings, the child is removed from his parents' care and control and placed in the custody of the department, the provisions of this Chapter shall govern the subsequent *968 review process until such time as the child achieves a permanent placement as defined in Article 603(15). (Emphasis ours.)
LSA Ch.C. art. 702.
A. The court shall conduct a dispositional review hearing within nine months after the disposition hearing if the child was removed prior to disposition or within twelve months if the child was removed at disposition, but in no case more than twelve months after the removal. Dispositional reviews shall continue to be held at least once every twelve months thereafter until the child is permanently placed or earlier upon motion of a party for good cause shown or on the court's own motion. (Emphasis ours.)
B. In the discretion of the court, dispositional review hearings need not be conducted for a child who the court has determined should remain permanently in foster care with a specific foster family or for a child who has been placed in an adoptive home pending finalization of adoption pursuant to Title XII.
Permanent placement is defined in the Children's Code as: (1) return of the legal custody of a child to his parent(s); (2) placement of the child under a guardianship of the person; (3) placement of the child with adoptive parents pursuant to a final decree of adoption. La Ch.C. art. 603(15).
Under Articles 1015(1), (4), and (5) of the Children's Code, parental rights may be terminated when: (1) the parent has been convicted of a crime against the child who is the subject of this termination proceeding or against another child of the parent and the parent is now unfit to retain parental control, and there is no reasonable expectation of his reformation in the foreseeable future; (4) one year has elapsed since a child in need of care adjudication, the parent is unfit to retain parental control, and the parent has shown no significant, substantial indication of reformation, and there is no reasonable expectation of his reformation in the foreseeable future; or (5) one year has elapsed since a child was removed from the parent's custody pursuant to a court order in a child in need of care proceeding and placed either in the custody of an agency or individual, the parent is now unfit to retain parental control, and there is no reasonable expectation of his reformation in the foreseeable future, and the department has made every reasonable effort to reunite the child with his parents to no avail but now recommends that reunification would not be in the best interests of the child.
Proceeding under these three sections of Article 1015, the state was required to prove the alleged facts supporting the termination of Mrs. Biggs' parental rights by clear and convincing evidence. LSA Ch.C. art. 1035. When the court finds that the alleged grounds set out in any paragraph of Article 1015 are proven true by the evidentiary standards required by Article 1035, it may order the termination of the parental rights of the parent against whom the allegations are proven. LSA Ch.C. art. 1037.
If the court finds that termination of parental rights is not in the best interests of the child, the court may: (1) dismiss the petition; (2) reinstate the parent to full care and custody of the child; (3) if the child has been previously adjudicated as a child in need of care, reinstate that proceeding pursuant to Title VI; (4) upon a showing of sufficient facts, adjudicate the child in need of care in accordance with Title VI; (5) upon a showing of sufficient facts, adjudicate the family in need of services in accordance with Title VII; or (6) make any other disposition that is in the best interest of the child. LSA Ch.C. Art. 1039.
In termination of parental rights cases, factual findings are subject to the manifest error standard. State in the Interest of V.T., 609 So.2d 1105 (La.App.2d Cir. 1992). Great weight is attached to the exercise of the trial judge's discretion, which will not be disturbed on review if reasonable men could differ as to the propriety of the trial court's action. On the other hand, the discretion vested in the trial court must be exercised in whole-hearted good faith and be guided by the statutes, not by the court's private opinion of what the statute ought to be. Where the exercise of discretion is arbitrary and not judicial, and the judgment is unjust, it will be set aside. State v. Talbot, *969 408 So.2d 861 (La.1980) on rehearing. The ambit of a trial court's discretion is determined by the reasons for the existence of the discretionary allowance. Some of the more important reasons for deferring to the trial court's exercise of discretion are its observation of the witnesses and its superior opportunity to get the feel of the case. State v. Willis, 566 So.2d 1064 (La.App.2d Cir.1990).

Discussion
Although the trial court found that the state presented sufficient evidence under the statute to allow the court to terminate the Biggs' parental rights, termination is a severe measure and is not automatically mandated when the state proves the elements listed under Article 1015. The overarching principle is the best interest of the child. LSA-Ch.C. art. 1039; State in the Interest of V.T., supra. Indeed the trial court has discretion within the framework of child in need of care proceedings to sculpt an appropriate remedy utilizing all of the resources available to it. LSA-Ch.C. 1039(6). We do not find that the trial court abused its discretion in this instance.
Although the Biggs had previously neglected their children and at the time of trial were not capable of caring for the children, the social workers and psychologists testified that Mrs. Biggs might one day be able to parent the children appropriately. The evidence revealed that Mrs. Biggs' relationship with Mr. Biggs was a considerable obstacle to her growth. Now that Mr. Biggs is deceased, if the state desires to again pursue termination, it is appropriate for the trial court to revisit the issue of termination of parental rights which remains a viable remedy in these ongoing child in need of care proceedings. Although free to pursue the termination of parental rights notwithstanding the change in circumstances resulting from Mr. Biggs' death, the state remains obligated on remand to provide rehabilitation services to Mrs. Biggs prior to seeking termination. See La.Ch.C. arts. 675, 684(B), 690.
Despite our recognition of the discretion of the trial court, our remanding of this case is made pursuant to Chapter VI of the Code for children in need of care. In particular, we would emphasize the goals and procedures for further dispositional review hearings discussed in Articles 701 and 702. Such dispositional reviews should be routinely held at least once every twelve months until permanent placement of the children is achieved. In view of the present record where such dispositional reviews did not occur between December, 1992 and December, 1994 and because of the delays which have now occurred for this appeal, our remand of this case shall direct the trial court to conduct such hearing in accordance with Article 702 within sixty (60) days.
The concept of permanent placement is defined in Article 603(15). In the absence of a placement of the children under a guardianship which is not urged or indicated in this case, the Code's emphasis on permanent placement under Articles 701 and 702 requires the court to either (a) return the legal custody of the children to their parent, or (b) terminate the parental right so that placement of the child with adoptive parents may be facilitated.
Unprepared to return the children to Mrs. Biggs' custody, the trial court apparently turned to Article 702 B and the option of a permanent foster care arrangement. We have reviewed this option for permanent placement with a "specific foster family" in light of the primary definition of permanent placement discussed above under Article 603(15) and in light of provisions in the federal permanency planning mandates of the Adoption Assistance and Child Welfare Act of 1980 to which the dispositional review provisions of Chapter 16 of Title VI of the Code are responsive. See 1991 Comment to Article 701 and 42 U.S.C. § 601 et seq.
Instructive for an understanding of Article 702 B is the provision defining an appropriate "case review system" as set forth in 42 U.S.C. § 675(5)(B) which provides that:
... the status of each child is reviewed periodically ... in order to determine the continuing necessity for and appropriateness of the placement, the extent of compliance with the case plan, and the extent of progress which has been made toward *970 alleviating or mitigating the causes necessitating placement in foster care, and to project a likely date by which the child may be returned to the home or placed for adoption or legal guardianship. (Emphasis supplied)
Furthermore, from our reading of Subsection C of this statute defining the case review system, the federal emphasis indicates that foster care on a permanent or long-term basis should be employed when, "because of the child's special needs or circumstances," adoption has proven difficult. These federal provisions stress that the goal of permanent placement is to timely end the uncertainty of temporary foster care arrangements. Such goal has been frustrated in this case.
With this understanding of the relationship of Article 603(15) and Article 702(B) concerning permanent placement, the trial court's choice of the remedy of long-term foster care in this case without the identification of a "specific foster family" by the state was premature. While the state, in harmony with the above federal objectives, identifies in its brief situations where it recommends long-term foster care due to the inability to make placement with adoptive parents, it has not sought such placement with a specific foster family in this case. Under the Article 603(12) definition of "foster care," such arrangement is a placement of the child which is "approved and supervised by the state." Thus, a trial court's employment of the option for long-term foster care should be based upon the state's identification and approval of a specific foster family with a long-term commitment to the child.
Accordingly, on remand of this case, should the state continue to pursue termination of Mrs. Biggs' rights, the trial court's discretion under Article 1037 should be guided by this statutory emphasis on permanent placement for the children as defined in Article 603(15).

Conclusion
We hereby dismiss Mr. Biggs' appeal from the judgment reducing his visitation with the children. Recognizing the trial court's great discretion, we affirm the trial court's refusal to terminate parental rights. The judgment ordering long-term foster care is reversed as being premature, and we remand for a dispositional hearing to be held within sixty days from the date of this opinion in accordance with La.Ch.C. art. 702.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.